# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| RICHARD ROEDOCKER,<br><br>                    Plaintiff,<br><br>vs.<br><br>FARSTAD OIL, INC.,<br><br>                    Defendant. | CV 16-29-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |

Plaintiff Richard Roedocker brings this wrongful discharge action against Defendant Farstad Oil, Inc. ("Farstad").

Now pending is Farstad's Motion for Summary Judgment (the "Motion"). (Doc. 39.)  Having reviewed the parties' briefs and attendant exhibits, and for the reasons set forth below, the Court recommends that Farstad's Motion be denied.

## I.    Pertinent Facts

Farstad sells and distributes refined petroleum products on a wholesale basis. (Doc. 45 at ¶ 1.)  Farstad is headquartered in Minot, ND, and has a branch in Billings, MT.  (*Id*. at ¶ 2.)  Farstad and its associated retail business, Superpumper, comprise SPF Energy ("SPF"); SPF was purchased by Parkland Fuel Corp. ("Parkland") in January of 2014.  (*Id*. at ¶¶ 3-4.)  Merv Carter became the Director of Sales and Operations for Farstad following Parkland's acquisition of SPF.  (*Id*. at ¶ 5.)

Roedocker began working for Farstad in 1991.  (*Id*. at ¶ 87.)  At the time Parkland acquired Farstad, Roedocker was Branch Manager of the Billings branch, and he reported directly to Carter following the acquisition.  (*Id*. at ¶¶ 14, 15.)

During his first meeting with Carter in January, 2014, Roedocker discussed his concern with Farstad's practice of "commingling" petroleum product, which is the practice of substituting unbranded product for branded product (*Id*. at ¶ 18.)  That is, supplying branded stations, such as Exxon, Conoco, or Cenex, with a different brand of fuel.  (*Id.* at ¶¶ 166-167.)  According to Roedecker, Farstad's commingling practice constituted deceptive mislabeling of fuel products, and resulted in providing customers with a less desirable fuel product than they contracted for.  (*Id.* at ¶ 28.)  Roedocker also discussed the issue of commingling with Carter in at least two subsequent telephone calls over the next sixteen months.  (*Id*. at ¶ 20.)  Roedocker maintains that Carter dismissed his concerns, citing the need for corporate profits.  (*Id.* at ¶ 21.)

Carter became critical of Roedocker's "communication" skills following the Parkland acquisition.  According to Farstad, Roedocker's communication deficiencies included failing to report workplace events that Roedocker was required to report, failing to explain adequately details of contracts he arranged so that others within the company could understand them, and communicating with coworkers "loudly, aggressively, and bluntly."  (*Id*. at ¶¶ 38-71.)  This

communication issue is a source of considerable dispute between the parties.

Farstad maintains that Carter's complaints about Roedocker's communication

described legitimate deficiencies he sought to correct in an employee.  Roedocker

generally denies that he had communication problems, and specifically denies

several of the events Farstad cites as examples of Roedocker's poor

communication. (*See, e.g., Id*. at ¶ 50.)  Rather, Roedocker interprets the

complaints about his communication as an effort to pad his employee file with

nebulous and impossible-to-disprove violations to justify his eventual termination.

Regardless of the parties' dispute as to the legitimacy of Roedocker's

communication problem, it is undisputed that Roedocker's communication was the

subject of several discussions between Carter and Roedocker, and resulted in

multiple written corrective warnings.  (*Id*. at ¶¶ 46, 59, 64.)

On January 12, 2015, several managerial-level employees in various

locations participated in a teleconference meeting.  (Doc. 16 at ¶ 17.)  Relevant

parties to the meeting included Roedocker, Safety Manager Roger Pelzer, and

Minot Branch Manager Lori Thom.  (Doc. 45 at ¶ 72.)  Roedocker asserts that

Pelzer objected to certain issues Thom raised during the meeting, and that Pelzer

sent Roedocker a text message, stating "[w]hat's the f***ing b**ch doing?"  (*Id.* at

72.)  Roedocker responded with a text to Pelzer in which he referred to Thom as a

"c**t."  (*Id.*)  According to Pelzer's testimony, Pelzer informed Farstad Human

3

Resources Manager Natalie Mussell about Roedocker's text message immediately after the meeting.  (*Id*. at ¶ 110.)  No action was taken on the text message for the next four months.

At a subsequent managers meeting on April 28, 2015, Roedocker again raised the commingling issue.  (Doc. 45 at ¶ 31.)  On this occasion, he reportedly voiced his concern that Farstad's Minot branch had provided the Fargo and Billings branches with an inferior quality diesel fuel, and had overcharged the other branches for the type of fuel they received.  (*Id*. at 32.)  According to Roedocker, raising the commingling issue again in this environment angered Carter.  (*Id.* at ¶¶ 28, 34.)

Shortly thereafter, Mussell, in her capacity as Farstad's Human Resources Director, initiated an investigation into Roedocker's text message to Pelzer.  (Doc. 43-1 at 169:13-170:2.)  While the exact date is unclear, Carter testified that Mussell informed him of the offensive text message from Roedocker in "kind of mid-May" of 2015, and the investigation was initiated soon thereafter.  (*Id*. at ¶ 73; *see also* Doc. 43-1 at 168:25-170:2.)  Farstad has provided no explanation for the four-month delay in taking any action on the text message.

Roedocker admitted during the investigation that he sent the text message, and Carter terminated Roedocker's employment from Farstad on May 21, 2015. (*Id*. at ¶¶ 73, 83.)  The document memorializing Roedocker's termination (the

"Termination Decision") discusses the various written corrective warnings Roedocker received, the issues surrounding his communication, and finally the text message he sent about Thom.  (Doc. 43-15.)  The Termination Decision concludes, "[d]ue to the seriousness of the remark from a leader of SPF Energy and overall poor communication, [Roedocker's] employment with SPF Energy is being terminated effective immediately."  (*Id*. at 2.)

The Court will discuss additional facts below as necessary.

## II.    Parties' Arguments

Farstad argues that summary judgment is proper in this case because the undisputed facts demonstrate that it had good cause to terminate Roedocker.  It dismisses as purely speculative, and therefore insufficient to defeat summary judgment, Roedocker's claims that (1) the text message issue is a pretext to disguise the actual basis for termination, and (2) that he was terminated in retaliation for raising the commingling issue.

In response, Roedocker argues that there are disputed issues of material fact surrounding: (1) whether he was terminated for good cause; (2) whether the stated reason for his discharge, even if it could constitute good cause, was merely a pretext; and (3) whether he was terminated for reporting a violation of public policy.  Based on those alleged factual issues, Roedocker argues that summary judgment is improper.

The parties' arguments will be discussed in greater detail below as appropriate.

## III.   Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.   *Id*.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider

the nonmoving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for

summary judgment." *Anderson*, 477 U.S. at 255.

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact. *Kennan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co. of Am., 55 F.3d 247, 251 (7th Cir. 1995)).

## IV.    Discussion

Roedocker brings his claims against Farstad under Montana's Wrongful Discharge from Employment Act ("WDEA"), Mont. Code Ann. § 39-2-901, *et seq.* The WDEA provides:

(1) A discharge is wrongful only if:

(a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

(b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

(c) the employer violated the express provisions of its own written personnel policy.

(2)(a) During a probationary period of employment, the employment may be terminated at the will of either the employer or the employee on notice to the other for any reason or for no reason.

Mont. Code Ann. § 39-2-904. Unless otherwise provided, the probationary period is six months from the date of hire. *Id.*

8

Following the dismissal of Roedocker's claim under Mont. Code Ann. § 39-2-904(1)(c) (*see* Doc. 11 at 11-12), Roedocker's WDEA claims presently include: (A) that his discharge was not for good cause, because (1) Farstad lacked reasonable job-related grounds to terminate him, in violation of Mont. Code Ann. § 39-2-904(1)(b), and (2) the stated basis for his termination was a pretext; and (B) he was discharged for reporting violations of public policy, in violation of Mont. Code Ann. § 39-2-904(1)(a).  (Doc. 7 at 6.)  Farstad now moves for summary judgment on each of these claims.

## A.    Good Cause

The WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reasons."  Mont. Code Ann. § 39-2-903(5).  A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and…must have some logical relationship to the needs of the business."  *Baumgart v. State of Montana*, 332 P.3d 225, 231 (Mont. 2014) (quoting *Sullivan v. Continental Const. of Montana, LLC*, 299 P.3d 832, 835 (Mont. 2013)).

A court may not substitute its judgment for an employer's discretion in employment matters: "[i]t is inappropriate for courts to become involved in the day-to-day employment decisions of a business."  *McConkey v. Flathead Elec.*

9

*Corp.*, 125 P.3d 1121, 1126 (Mont. 2005).  An employer's discretion is greatest "where the employee occupies a 'sensitive' managerial position exercising 'broad discretion[.]'" *Id*. (quoting *Buck v. Billings Mont. Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991)).  However, the Montana Supreme Court has clarified that:

> An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment.  The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business.

*Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 8 (Mont. 1993)).

 "To defeat a motion for summary judgment on the issue of good cause, the employee may *either* prove that the given reason for the discharge is not good cause in and of itself, *or* that the given reason is a pretext and not the honest reason for the discharge." *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (emphasis added) (quotations omitted).  The Court will discuss Roedocker's claims in turn.

### 1.    Good Cause for Termination

Farstad maintains that it had a legitimate business reason for terminating Roedocker, and therefore that he was terminated for good cause as a matter of law. (Doc. 40 at 3-7.)  Farstad argues that "[t]here is no dispute Plaintiff sent his

offensive text message, contrary to the expectations Farstad reasonably placed on management employees, in violation of general Company policies, and in violation of specific warnings Plaintiff had received about his workplace communications." (*Id*. at 5-6.)  Farstad characterizes the text message Roedocker sent about Thom as "the culmination of a long history of uncorrected workplace communication issues" and as "so outrageous and offensive that Farstad could no longer employ him."  (*Id*. at 6.)

Roedocker responds that Farstad lacked good cause to terminate him, "because crude language was rampant at Farstad, and it never resulted in discipline."  (Doc. 44 at 13.)  He cites as evidence the fact that Pelzer was not terminated, even though his crude text preceded and prompted Roedocker's response.  (*Id*.; *see also* Doc. 45 at ¶ 79.)  Citing to his own deposition, Roedocker also identifies multiple other examples of Farstad employees allegedly using crude and offensive language without discipline.  (Doc. 45 at ¶ 79.)

As explained above, the Montana Supreme Court has defined a "legitimate business reason" as one that is "neither false, whimsical, arbitrary or capricious." *Baumgart*, 332 at 231.  Roedocker does not deny that he sent a text message on his company-provided phone referring to Thom as a "c**t."  He presents no argument that terminating an employee under these circumstances is false or whimsical. Rather, his argument is focused on the "arbitrary or capricious" facet of the

definition provided in *Baumgart*.  Specifically, he argues that Farstad did not have good cause to terminate him when it routinely addresses similar behavior, if at all, with discipline short of termination.

The Court disagrees.  First, the Court must remain mindful both that it is inappropriate for the Court to insert itself into the day-to-day personnel decisions of defendant companies, and that companies' discretion is highest when dealing with managerial employees.  It is undisputed that, as Billings Branch Manager, Roedocker was one of Farstad's five highest-paid employees; he had managerial responsibility for 35-40 people; and he had the right to discipline employees, up to and including termination.  (Doc. 45 at ¶¶ 13-17.)  Even assuming coarse language was generally tolerated at Farstad, Roedocker has presented no evidence that Farstad has ever tolerated one of its branch managers describing another branch manager in language as reprehensible as Roedocker's description of Thom.  There can be no serious dispute that a company has good cause to terminate a managerial employee – especially one as senior as Roedocker – for calling a female co-worker a "c**t," and the Montana Supreme Court has affirmed terminations involving the use of language far less repugnant than Roedocker's in this case.  *See Becker*, 191 P.3d at 442-443 (upholding a termination when an employee told his supervisor to "kiss my ass" and called another a "prick").

Moreover, even assuming the examples of coarse language Roedocker cites

are true, a general tolerance of coarse language in the workplace does not obligate Farstad to abide every instance of crude and offensive language.  Farstad certainly has the right to set legitimate boundaries for acceptable workplace behavior, and Roedocker crossed that boundary here.

Roedocker's reliance on the Montana Supreme Court case *Johnson v. Costco* is also unavailing.  According to Roedocker, *Johnson* stands for the proposition that "inconsistent application of employee policies" may be sufficient to defeat summary judgment on the issue of good cause.  *Johnson* is distinguishable.

The issue in *Johnson* was whether violation of an employment policy constituted *per se* good cause for termination where the employer had no independent basis for termination.  *Johnson*, 152 P.3d at 734.  Johnson was employed in Costco's bakery, and he had been terminated for violating Costco's "grazing policy" by taking a bite out of an out-of-date pastry which was designated for disposal.  In challenging his termination, Johnson submitted evidence that others had committed similar violations of the grazing policy and had not been disciplined.

The Montana Supreme Court rejected Costco's argument that a violation of an employer's employment policy constitutes good cause for discharge as a matter of law.  *Id.* at 734.  Given the evidence of inconsistent application of the grazing policy, the Court held that a jury could conclude that Costco "did not have good

13

cause to discharge Johnson because it applied its employment policy in an arbitrary and capricious manner." *Id.*

*Johnson* is distinguishable because Farstad has never maintained that a violation of its company policies is the sole basis for Roedocker's termination. Roedocker relies heavily on an excerpt from Carter's deposition suggesting violation of company policies was the only reason for the discharge. (S*ee* Doc. 44 at 14.) But Carter told Roedocker's counsel prior to making that statement that the basis for Roedocker's termination was stated "explicitly in the termination letter," and that he thought "it would be most effective if we read it from there." (Doc. 43-1 at 191:24-192:5.) As explained above, at least one of the grounds stated in the Termination Decision – "the seriousness of the remark from a leader of SPF Energy" – provided good cause for Roedocker's discharge on its own, independent of the alleged violation of company policy. (Doc. 43-15 at 2.)

Having concluded that the offensive text message constituted good cause for Roedocker's termination, the Court need not consider whether Roedocker's communication issues also provided grounds for discharge. While Roedocker certainly disputes the charge of poor communication (s*ee, e.g.,* Doc. 45 at ¶ 54.), that issue is not a material issue of disputed fact precluding summary judgment where Farstad has established independent grounds for Roedocker's discharge. *See e.g. Davis v. State Dept. of Public Health and Human Services*, 357 P.3d 320,

322 (Mont. 2015) (holding that factual disputes "do not render summary judgment inappropriate where there are facts *not* in dispute that provide 'good cause' for discharge from employment") (emphasis in original)).

In sum, Farstad had good cause to terminate Roedocker for his conduct in referring to another branch manager in vulgar terms.  That reason was neither false, whimsical, arbitrary, nor capricious, and therefore constitutes a legitimate business reason under the WDEA.

### 2.    Pretext

Finding good cause for termination does not end the inquiry.  As explained above, a plaintiff may also defeat summary judgment by showing "that the given reason is a pretext and not the honest reason for the discharge."  *Becker*, 191 P.3d at 441.  Accordingly, even though Farstad had good cause to terminate Roedocker, his termination may still violate Mont. Code Ann. § 39-2-904(1)(b) if the good cause reason was merely a pretext for the actual reason.

To defeat summary judgment on the issue of pretext, "the employee 'must prove that the given reason for the discharge…is a pretext and not the honest reason for the discharge.'"  *Arnold v. Yellowstone Mountain Club, LLC*, 100 P.3d 137, 142 (Mont. 2004) (quoting *Mysse v. Martens*, 926 P.2d 765, 770 (Mont. 1996)).  An employee fails to meet his burden when he does not present some evidence in the record substantiating his claim of pretext; "mere denial or

15

speculation will not suffice." *Johnson*, 152 P.3d at 734-735.

Roedocker maintains that Farstad actually terminated him for repeatedly raising the commingling issue, and more specifically following "a heated meeting on April 28, 2015, in which Roedocker openly discussed Farstad's deceptive practices[.]"  (Doc. 44 at 14.)  In response, Farstad contends that Roedocker has presented no evidence that Farstad cared about the commingling issue, as demonstrated by the undisputed fact that Roedocker had been raising the issue with Carter for well over a year before he was terminated.

The Court finds that there are factual issues relevant to the pretext issue that preclude summary judgment.  First, Roedocker's pretext argument is arguably supported by the undisputed four-month delay between the time Pelzer reported the offending text message to Mussell, and the time Mussell began the investigation that concluded with Roedocker's termination.  Farstad has not presented any evidence as to the reason for that delay.  Carter testified that Mussell did not inform him of the text message until May, 2015, and Mussell began her investigation soon thereafter.  (Doc. 43-1 at 168:25-169:7.)  Nevertheless, that does not explain why Mussell waited several months to inform Carter of the text message and begin her investigation, and nothing in the record sheds any light on that question.

In addition, while evidence that Farstad had previously condoned coarse,

offensive language in the workplace prior to Roedocker's discharge is not sufficient defeat good cause, it is relevant to the issue of pretext.  If it can be established that crude and offensive language was widespread and permitted by Farstad, as Roedocker has testified, a jury may reasonably infer that Roedocker's text message was not the true reason for his discharge.

Finally, the fact that Carter later conceded the gravity of the commingling issue lends some support to Roedocker's contention that commingling was a significant problem for Farstad.  Carter testified at length about his ultimate discovery of the seriousness of the commingling issue.  (Doc. 43-1 at 225:6-230:13.)  He testified that Farstad ran a report on the extent of commingling, the results of which he called "alarming." (*Id*. at 228:17-19).  The investigation culminated in Carter's realization that "the magnitude of" the commingling issue explained Roedocker's repeated complaints.  (*Id*. at 230:11-13.)  Given the seriousness of the issue, a jury could reasonably conclude from all of the evidence that Farstad terminated Roedocker because he had identified, and refused to ignore, an ongoing problem.  (Doc. 43-1 at 225:6-230:13.)

Therefore, viewing all inferences drawn from these undisputed facts in the light most favorable to Roedocker, as the Court must at this stage, a reasonable jury could conclude that the four-month delay suggests that Mussell did not consider the text message to be of much concern when she first learned about it,

and Farstad later used the text message as a pretext to terminate Roedocker. The fact that the text message provided good cause, in and of itself, to terminate Roedocker does not prevent Roedocker from proving that the text message was used as a pretext to terminate him for some other reason. *See e.g. Henrichs v. Safeway, Inc.*, 2014 WL 6610046, *7-8 (D. Mont. Nov. 20, 2014) (finding good cause for termination but denying summary judgment due to a fact issue regarding pretext).

Because Roedocker has come forward with sufficient evidence to create an issue of fact regarding pretext, his WDEA claim under Mont. Code Ann. § 39-2-904(1)(b) should survive summary judgment.

## B. Retaliation

A discharge is wrongful under the WDEA if it "is in retaliation for refusal to violate public policy or for reporting a violation of public policy." Mont. Code Ann. § 32-2-904(1)(a). Good faith "whistle blower[s]" are protected, regardless of whether the report results in a citation or investigation. *Motarie v. N. Mont. Jt. Refuse Disposal Dist.*, 907 P.2d 154, 157 (Mont. 1997) (citation omitted). "Public policy" is defined as "a policy in effect at the time of the discharge concerning the public health, safety, or welfare established by constitutional provision, statute, or administrative rule." Mont. Code Ann. § 39-2-903(7). To overcome a motion for summary judgment, a plaintiff must present evidence showing that he was

discharged because he reported a violation of public policy. *Moe v. Butte-Silver Bow Co.*, 371 P.3d 415, 426 (Mont. 2016). "Unless an employee is discharged for reporting a violation of public policy, there can be no claim under this particular statutory provision." *Henrichs*, 2014 WL 6610046 at *4.

Roedocker contends that commingling is a violation of public policy, and that Farstad contravened Mont. Code Ann. § 32-2-904(1)(a) because it terminated him in retaliation for reporting that public policy violation. In an effort to establish that commingling is a public policy violation, Roedocker cites "Mont. Code Ann. § 82-15-101 *et seq*.," which generally provides for the regulation of petroleum products under Montana law. (Doc. 7 at ¶ 50.) This imprecise citation is of marginal assistance in determining which statute Roedocker alleges Farstad violated. Nevertheless, Farstad does not appear to dispute that commingling is a violation of public policy, and Carter's testimony that in some instances Farstad's commingling practices were "really below industry standard" suggests that Farstad would agree that commingling, at least at some point, violates public policy. (Doc. 43-1 at 227:2-5.) Accordingly, the Court will assume, without deciding, that commingling constitutes a public policy violation within the meaning of the WDEA.

In support of summary judgment, Farstad argues that Roedocker has failed to present any evidence to establish a causal relationship between Roedocker's

report of the product substitution and his termination.  Further, Farstad argues that the retaliatory action must occur within a short period of time after the protected action for the plaintiff to establish a causal link, and that Roedocker cannot satisfy that condition here because he began reporting the commingling violation more than a year before he was terminated.  Finally, Farstad contends that it had a legitimate business reason for terminating Roedocker, and this undermines the argument that the action could be retaliatory.  (Doc. 40 at 7-11.)

The parties agree that Roedocker last raised concerns about commingling at the manager meeting on April 28, 2015.  (Doc. 45 at ¶¶ 31, 36.)  Roedocker argues, among other things, that his termination was retaliatory because it occurred less than a month after he last raised his commingling concerns.

It is undisputed that Roedocker first raised the commingling issue with Carter some sixteen months before he was terminated, and then raised the issue on at least two other occasions before the April 28, 2015, manager meeting. Therefore, it is reasonable to infer that, had Farstad desired to retaliate against Roedocker for reporting the commingling issue, it would have done so long before May of 2015.

Nevertheless, there are also facts in the record that tend to support Roedocker's retaliation theory.  First, while pretext and retaliation are not inextricable from one another, the same issues of material fact that preclude

summary judgment on the issue of pretext are germane to Roedocker's retaliation claim.  That is, the delay in taking any action on the offensive text for over four months, and evidence that crude, offensive language was condoned by Farstad, create an issue of fact as to the whether the text message was the actual reason Roedocker was fired.  Absent a clear basis for the termination, Roedocker's theory that he was retaliated against for raising the commingling issue becomes more viable.

Next, the fact that commingling of petroleum products was a serious issue could allow a reasonable jury to infer that Farstad desired to silence Roedocker's ongoing exposure of the problem.  The Court disagrees with Farstad's assertion that "[w]hether or not inappropriate product substitution was actually occurring is not a material fact in this motion for summary judgment."  (Doc. 46 at 11.)  Farstad's admission that it was inappropriately commingling product is material to the issue of retaliation.  Drawing all reasonable inferences in Roedocker's favor, it lends credence to the theory that Farstad had reason to retaliate against Roedocker for continuously bringing to light a legitimate and potentially costly issue.

Additionally, the temporal proximity between the April 28, 2015 meeting and Roedocker's termination supports the retaliation claim.  In analyzing retaliation claims in a Title VII context, "[t]he Ninth Circuit generally has held that a period of less than three months between a plaintiff's protected activity and an

adverse employment action is sufficient to raise an inference of causation." *Kelley v. Billings Clinic*, 2014 WL  223377, *19 (D. Mont. Jan. 21, 2014), citing *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1111, 1113 (9th Cir. 2003) (interval of less than a month between protected activity and adverse action sufficient for causal link); *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865-66 (9th Cir. 2003) (holding that temporal proximity supported causal link where plaintiff was placed on administrative leave about three weeks after complaining, was returned to duty and placed back on leave almost three months after complaining and was ultimately terminated seven months after complaining); and *Yartzoff v. Thomas*, 809 F.3d 12371, 1376 (9th Cir. 1987) (sufficient causation evidence found when adverse action taken less than three months after a complaint was filed, two weeks after the charge was first investigated, and less than two months after the investigation ended).

Here, Roedocker discussed commingling at the April 28, 2015, manager meeting, and Farstad discharged Roedocker from his position on May 21, 2015. The temporal proximity of approximately three weeks between Roedocker's latest complaint and his termination could raise the inference that Roedocker was terminated for his conduct at that meeting, especially considering that Farstad's stated reason for discharging Roedocker (the text message) occurred nearly four months prior, and that Farstad cited Roedocker's conduct at the April 28, 2015,

meeting as a factor in his termination.  (Doc. 43-15 at 2.)

Ultimately, the Court is required at this juncture to draw all reasonable inferences in Roedocker's favor, and the Court finds that Roedocker has pointed to sufficient evidence to raise a genuine issue of material fact as to whether he was terminated in retaliation for reporting a public policy violation.  Because Roedocker has come forward with sufficient evidence to create an issue of fact regarding retaliation, his WDEA claim under Mont. Code Ann. § 39-2-904(1)(a) should survive summary judgment.

## V.   Conclusion

Based on the foregoing findings, IT IS RECOMMENDED that Farstad's Motion for Summary Judgment (Doc. 39) be **DENIED**.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

//

//

DATED this 19th day of January, 2018.

_____

TIMOTHY J. CAVAN
United States Magistrate Judge